Donald H. Mead, J.
The defendant, Henry N. Lago, moves for an order dismissing the indictment against him and the several counts thereof. The indictment contained two counts charging the defendants Lago and one Edward Lawrence Loocerello, in the first count thereof, with violation of subdivision 2 of section 2460 of the Penal Law as follows:
THE GRAND JURY OF THE COUNTY OF ONONDAGA by this indictment accuse edwabd Lawrence loocerello, a/k/a “ Whitey Looker ”, and henry n. lago of the crime of compelling and attempting to induce, entice, procure and COMPEL A FEMALE TO LIVE A LIFE of prostitution, in Violation of § 2460 of the Penal Law of the State of New York, subdivision 2, committed as follows:
The said edward Lawrence loocerello; aA/a “ Whitey Looker ”, and henry n. lago, on or about the 1st day of September 1957, the exact date being unknown to this Grand Jury, at the City of Syracuse. In this County, acting together, the said edward Lawrence loocerello being then and there the paramour of one Jeri Ann Clapper, and the said henry n. lago being then and there a taxi driver for the Yates Taxi Company, arranged for and did secure the introduction of the said Jeri Ann Clapper to the said Henry N. Lago, for the purpose of having the said Henry N. Lago procure male customers with whom the said Jeri Ann Clapper would perform acts of prostitution; and that the said Henry N. Lago did procure for the said Jeri Ann Clapper her first customer, and the said Henry N. Lago gave her instructions concerning the method of charging and caring for her customers; and that the said Edward Lawrence Loocerello, also known as “Whitey Looker ”, and Henry N. Lago, each aiding and abetting the other, did thereby and continuously after the 1st day of September, 1957, up to and including on or about the 16th day of May, 1958, willfully, wrongfully and feloniously compel and attempt to induce, entice and compel the said female, Jeri Ann Clapper, to lead a life of prostitution.
The second count of the indictment charges said defendants with a violation of subdivision 6 of section 2460 of the Penal Law as follows:
• And the grand jury of the County of Onondaga aforesaid by this indictment further accuse the said edward Lawrence loocerello, a/k/a “ Whitey Looker ”, and henry n. lago, of the crime of knowingly receiving money without consideration from the proceeds and earnings of a woman engaged in prostitution, in violation of § 2460, subdivision 6 of the Penal Law of the State of New York, committed as follows:
The said edward Lawrence loocerello, a/k/a “ Whitey Looker ”, and henry n. lago, on or about the 1st day of September, 1960, the exact date being unknown to this Grand Jury, procured the said Jeri Ann Clapper for one George Traister, and the said Henry N. Lago, acting as the agent of the said Edward Lawrence Loocerello, a/k/a “WTiitey Looker ”, transported the said Jeri Ann Clapper in a taxicab which he was then and there operating, to the King George Motel, where an act of unlawful sexual intercourse took place between the said Jeri Ann Clapper and the said George Traister, for which the said George Traister paid the sum of Thirty Dollars ($30.00), which the said Jeri Ann Clapper turned over to Edward Lawrence Loocerello, a/k/a “ Whitey Looker ”, *1089and which was knowingly received by the said Edward Lawrence Loocerello, a/k/a “ Whitey Looker ”, and which said proceeds were shared by the said Henry N. Lago.
The defendant, Lago, entered a demurrer to the indictment, Avhich was denied by an order of this court made on February 19, 1962. Thereafter, the defendant, Lago, moved for an order allowing him to inspect the Grand Jury minutes and an order permitting said inspection was granted on March 7, 1962. This motion to dismiss is made following defendant’s inspection of the Grand Jury minutes.
Subdivision 2 of section 2460 of the Penal Law provides:
Any person who shall place any female in the charge or custody of any other person for immoral purposes or in a house of prostitution or elsewhere with intent that she shall live a life of prostitution; or any person who shall compel or shall induce, entice or procure, or attempt to induce, entice, procure or compel any female to reside with him or with any other person for immoral purposes, or for the purposes of prostitution or shall compel or attempt to induce, entice, procure or compel any such female to reside in a house of prostitution or compel or attempt to induce, entice, procure or compel her to live a life of prostitution shall be guilty of a felony and, on conviction thereof, shall be ptmishable by imprisonment for not less than two years nor more than twenty years and by a fine not exceeding five thousand dollars.
Subdivision 6 of section 2460 of the Penal Law provides:
Any person who shall knowingly receive any money or other valuable thing for or .on account of procuring and placing in the custody of another person for immoral purposes any woman, with or without her consent, shall be guilty of a felony and, on conviction thereof, shall be punishable by imprisonment for a period of not less than three years nor more than twenty-five years and by a fine not exceeding five thousand dollars.
Subdivision 9 of section 2460 of the Penal Law contains the provision:
No conviction shall be had under this section upon the testimony of the female unless supported by other evidence.
In coming to the precise questions raised by the defendant on this motion, it is the contention of the defendant, Lago, that there was a complete lack of any evidence in the Grand Jury minutes sufficient to support and corroborate the testimony of the female complainant, Jeri Ann Clapper, as required by subdivision 9 of section 2460 of the Penal Law.
The court has carefully examined the Grand Jury minutes in this case and in particular those portions and excerpts taken from the testimony of various. witnesses as set forth in the People’s answering affidavits, which testimony the District Attorney claims corroborates and supports, the testimony of the female complainant, Jeri Ann Clapper. References to such testimony are set forth below.
*1090With reference to the first count of the indictment,.it is clear from a reading of'the Grand Jury minutes that there was no evidence to warrant a charge against the defendant, Lago, that he placed any female in the charge or custody of any other person for immoral purposes or in a house of prostitution or elsewhere with intent that she shall live a life of prostitution or that he compelled, induced, enticed, procured or attempted to induce, entice, procure or compel any female to reside with him or with any other person for immoral purposes, or for purposes of prostitution as provided for in the first portion of subdivision 2 of section 2460 of the Penal Law. Likewise, there was no such evidence as would sustain a charge against the defendant, Lago, that he compelled such female to reside in a house of prostitution or to live a life of prostitution, as provided in the latter portion of that subdivision. Therefore, if the first count of the indictment ■charges the defendant with a crime, it must be on the theory that he attempted to induce, entice, procure or compel her to live a life of prostitution. (People v. Jelke, 1 N Y 2d 321.)
With reference to the second count of the indictment, the question presented is whether or not the evidence is sufficient, as a matter of law, to sustain the charge that the defendant, Lago, knowingly received any money or other valuable thing for, or on account of procuring and placing in the custody of another person for immoral purposes, any woman with or without her consent, in violation of subdivision 6 of section 2460 of the Penal Law. (Emphasis supplied.)
In order to best appreciate the purpose of section 2460, a reference to several decisions is, indeed, helpful. In People v. Draper (169 App. Div. 479, 484, Woodward, J.) the court, in considering section 2460 of the Penal Law as it then was, described it as “ obviously a patchwork affair ’ ’ and referred to its “ botchy and immaterial provisions” (p. 488). The court there found it impossible to apply individual parts of section 2460, unrelated to the whole, stating (p. 485): “ No one subdivision is to be picked out and literally applied as the district attorney, or even the parties, may suppose it to read, but the entire section, relating to one general subject, is to be read and interpreted * * * and so we are to give such construction to' subdivision 3 of the' act, under which this indictment was found, as the act, considered as a whole, suggests. ’ ’
A similar thought was thus expressed by Queens County Judge '' Golden, as he then was, in People v. Odierno (166 Misc. 108, 112): “ The evolution of section 2460 of the Penal Law, as it noAv ' exists, constitutes an attempt on the part of the Legislature to cope with the evil of commercialized prostitution. The statute in *1091question was not intended to place the erring .male at the mercy of the erring female, nor was it directed against individual or isolated acts of prostitution. Rather was it directed' against influential offenders whose business was gain through prostitution; its purpose was to reach the systemization of prostitution on a commercial basis.” (Italics from original.)
Likewise, in People v. Jelke (supra, p. 326, Van Voorhis, J.), the court stated;
Our problem in analyzing the ease stems in considerable part from the draftsmanship of section 2460 of the Penal Law. The principal object of this statute and its forerunners is to get the tycoons of organized vice, which it is conceded that Jelke was not, men such as the defendant in People v. Luciano (277 N. T. 348). The main purpose is not to reach the lowly pimp. To be sure, subdivision 8 of section 2460 is aimed at such unlovely characters, but defendant has not been convicted under that subdivision. The purpose has frequently been adverted to in opinions of the courts, e.g., “ The legislation dealt with the systematizing of prostitution and concubinage upon a commercial basis; it sought to prevent prostitution and concubinage as a business ”. It was designed to punish those “ conscienceless vampires who make merchandise of the passions of men ”.
The complainant testified before the Grand Jury relative to her keeping company with the defendant, Loocerello, and how she subsequently lived in a common-law relationship with him. She described her activities as a prostitute and relates that she turned the proceeds of the moneys she received therefrom to her paramour, Loocerello. The only references in her testimony regarding the defendant Lago, and which might be relied upon to sustain the indictment against him provided it was sufficiently corroborated, are as hereinafter set forth:
Q. And did there come a time when you had some conversation with him [Loocerello] concerning prostitution, insofar as you, yourself, were concerned ? A. Yes. Q. Now, who was present at the time ? A. Just he and I. Q. And where did this conversation take place? A. In the Showbar Restaurant. Q. And would you relate to us the substance of that conversation? A. Well, he called me at work that day and told me there was something very important he had to talk to me about, and for me to get dressed up and meet him at seven that night. So when I went there, he told me that his girls had got picked up at Rochester and Buffalo and he had to have the money to get them or he would go to jail. He said he wanted me to do him a favor, as so far I hadn’t been involved in this, so if he could have the money for the lawyers, that’s all he wanted. He said “ I have a few people I want you to meet.” So we went over to the Syraeuse-Yates Hotel Cab office in the Hotel Syracuse. Q. And who did you meet? A. He introduced me to Henry Lago. Q. Henry Lago, then and Loocerello, and you had a conversation ? A. Yes. Q. And this .would be at the Syracuse-Yates Cab Company office? A. Yes. Q. Where is that? A. On Onondaga Street.. It was the .-. . . the main office is in .the Yates Hotel,.but this is the office.out of the. Hotel Syracuse on Onondaga Street'. Q. This Is on' the' ground floor of the • Syracuse Hotel? A. Yes. * * * Q. Now, on the night that you and" Lago átid Loocerello had this conversation, were you living with Loocerello ? A. No, I wasn’t. Q. Did there come a time after that night when you and Loocerello *1092moved into one apartment? A. Yes. Q. How long after that particular evening was it that you moved into this apartment? A. About a week and a half after this conversation. Q. Did you move into the apartment at 850 West Onondaga St.? A. Yes: Q. Did you move into' that apartment under the name of Mrs. Edward Looeerello? A. Yes. Q. Did you thereafter continue to live for a period of time as Mrs. Edward Looeerello at 850 W’est Onondaga Street with Edward Looeerello? A. Yes. Q.. And during this period of time from September 1957 on, did you work with Henry Lago and the various cab drivers as a prostitute? A. Yes. Q. What did you do with the money that you would receive as a prostitute during this period of time? A. I gave it to him. Q. You gave it to Eddie Looeerello? A. Yes. Q. All of it? A. Yes. * * * Q. The income that you would receive as a prostitute during that period of time, what did you do with it? A. I still gave the money to him. Q. You gave all of it to Looeerello? A. Yes. * ® * Q. On the evening that you first met Henry Lago, was that the first time that you performed an act as a prostitute? A. Yes. Q. And did you meet Lago at the cab stand across the street from Cafe Rena? A. Yes, I did. Q. And this Cafe Rena, is that in the vicinity of the Syracuse Hotel? A. Yes. Q. Would that be across the street? A. Yes. Q. On East Onondaga? A. Yes. Q. At that time that you were introduced to Lago, was there a man in the cab waiting for you? A. Yes, there was. Q. And did Lago get in the cab, too, as a driver? A. Yes. Q. Where did you go? A. To the Yates Hotel. Q. That was the Yates Hotel here in Syracuse? A. Yes. Q. Lago drove the cab and you rode in the cab with the occupant? A. Yes. Q. Did you know who he was? A. No. Q. Had you seen him before? A. No. Q. Have you seen him since? A. No. Q. He was a white man? A. Yes. Q. About how old? A. About 35-37. Q. Did you go to a room at the Yates Hotel? A. Yes. Q. Was that in the name of the person you were with? A. Yes. Q. Do you recall the room or the floor? A. No, I don’t. Q. Did he pay you any money that evening, this occupant of this cab? A. Well, he paid me $10.00, because they didn’t tell me how to get the money. I just got in the cab. He said- for me to get the money and he wanted somewheres around $300.00, and to work for a few nights and I wouldn’t have to work any more. Q. This was Looeerello? A. Yes. So after I completed the affair with the trick, I asked him for $20.00, and he gave me $10.00 and told me to get out of the room. Q. Did you go? A. Yes. Q. Now, since that incident, that one evening you were telling us about, have you learned that there is some type of examination that you should be doing as a precautionary measure ? A. Yes. Q. Before you engage in any type of sexual activity with anyone of these males ? A. Yes. Q. This is an examination, a physical examination, that you do, of your person to see whether or not you might have some type of venereal disease? A. Yes. Q. Did you make any type of examination before you encountered this one person at the Yates Hotel? A. No. Q. Were you advised by some one subsequent to that particular incident as to what this, hygiene or physical examination is all about? A. Yes. Q. Who advised you about it? A. Lago, the cab driver. Q. The cab driver? A. Yes. Q. Did Lago also advise you as to how to get your money in advance? A. Yes. Q. Did Looeerello? A. After I had already got it all explained by Lago. After I had found out about it, he said a few things about it. Yes. He didn’t go into detail. Q. You received $10,00 on this particular incident. Did you give the $10.00 to Looeeréllo or did yon give somfe money to Lago and the rest to Looeerello? A. Lago let’me keep it. He gave me $4.00 more that I gave to Eddie because of the mix-up, this being the first time I had gone out; Q. He gave you $4.00 more? A...Yes. Q. So that you ended up with $14:00? A. Yes. Q. So that Lago gave you $4.00? And the trick as you called him gave you $10.00. A. Yes. Q. So that you actually received $14.00 on the first *1093incident? A. I had asked for $20.00. After Lago got his $6.00 from it, I wouldn’t have the $14.00, so Eddie would be mad at the incident. Lago gave me the extra $4.00 so I could give him the $14.00. Q. What happened was that Lago made up the difference between the $10.00 and the $20.00? A. Yes. Q. Do you know whether or not Lago has told this incident to Looeerello? A. Ño, I don’t. Q. On that same evening did you have another incident with another male? On that same night? A. Yes. Q. Did you have a conversation with Lago, before you had that incident? A. Yes. Q. And this is the conversation wherein you learned that you were to get $20.00. A. Yes. Q. And you were to get the $20.00 before you had any intercourse on sex with the male? A. Yes. Q. So that it is Lago, himself, who advised you at this point as to how to get the money? A. Yes. Q. Is Lago also advising you as to how to give this physical examination of this male in order to protect yourself from a health point of view? A. Yes. Q. Were his instructions .... tell us what his instructions were. Tell us what this physical examination is about, this physical examination that you should give. What did Lago tell you to do? A. He told me how to check for the clap and syphilis. How to find out the markings of syphilis. Q. And gonorrhea? A. Yes. Q. This would include washing the male and cheeking? A. Yes. Q. Thereafter, do you continue to perform this type of physical examination and inspection of any of the males with whom you have cohabited ? A. Yes. Q. How many men did you have intercourse with on that first night?' A. About 6 or 7 that I know. Q. Can you remember it was either 6 or 7? A. Yes. Q. One of them paid you $10.00? A. Yes. Q. What about the other five? A. I got $20.00 from all of them. Q. $20.00. Of this $20.00, $6.00 were to Lago and the balance went to Looeerollo? A. Yes. Q. Did you continue working in this fashion thereafter all during the period of time that you were living with Looeerello? A. Yes. Q. Did you continue to turn over all of this income to Looeerello? A. Yes. Q. Did you work any place other than Netti’s Wholesale during this period of time that you were with Looeerello? A. No. * * * Q. Now, I believe you told us that either Lago would call Looeerello, or Lago or one of the taxi drivers would come to get you at a bar? A. Yes. Q. What bar? A. The Showbar and the Cafe Rena. Q. Do you recall the second night? A. No, I don’t. Q. Do you recall the first night? Do you remember remaining somewhere with Looeerello on the first night during these incidents? A. Yes. Q. Where? A. At the Showbar Restaurant. Q. Looeerello is with you between the acts, so to speak? A. Yes. Q. When you would get finished with one of these intercourses, you would return to the Showbar? A. Yes. Q. And Looeerello would be waiting for you? A. Yes. Q. While you were there, did Looeerello receive any telephone calls? A. No. Q. Tell us how you would receive the call that there was another fellow waiting. A. They would call me up. Yes, the cab drivers would call him. Q. Looeerello would be waiting with you. Was this a pay telephone? A. Yes. Q. You were sitting near the telephone booth? A. Yes, sometimes. Q. Would somebody call Looeerello to the phone ? A. Yes. Q. Who did that? A. The bartender.”
The only testimony relied upon by the People to support and corroborate the testimony of the female complainant insofar as it relates fo the defendant Lago is as follows. The People called as a witness before the Grand Jury one Edward Martin and they claim that the following testimony given by Martin tends to corroborate the testimony of the female complainant:.
Q. Was Henry Lago a taxi driver'too? A. Yes, he was. Q. Now during those years, 1957 and 1958, did you have an occasion as a cab driver to transport *1094prostitutes to and from their places of residence to certain hotels in the City of Syracuse? A. Yes. Q. And do you know that. Henry Lago was in that same type of activity? A. He was.
The People also called as a witness before the Grand Jury one'. Thomas J. Sardino, a sergeant with the Syracuse Police Department, assigned to work in conjunction with the District Attorney’s office, who testified as follows:
Q. Are you also aecpiainted with a person named Henry Lago? A. I am. Q. Do you know what type of work Henry Lago has been engaged in? A. I know what type of work he has been engaged. Q. What type was that? A. Taxicab driver in the City of Syracuse. Q. Have you had occasion to interview or speak with Henry Lago recently? A. I have. Q. In particular, did you have occasion to speak with Henry Lago with regard to a particular incident involving Jeri Clapper and the exchange of money? A. I did. Q. Will you tell us when that conversation occurred? A. That conversation took place last Saturday, or Friday, last Friday. Q. That would be December 1, 1961? A. November 30th — Thursday, right. Q. Then it was Thursday, November 30th? You made a note or some reference of the date of this conversation? A. I have. Q. Will you tell us what that conversation was about? A. -1 interviewed Henry Lago relative to the exchange of some money with a girl known to me as Jeri Clapper. Q. Now previous to your talking with Henry Lago, had you also talked with Jeri Clapper? A. I had. I had Jeri Clapper tell me about the exchange of money with which you have reference. Q. Will you tell us what that exchange of money was about? A. Jeri Clapper, I questioned her relative to her first act of commercial prostitution and, of course, it had some very important significance to her and she recalled an incident relating to Henry Lago relative to him giving her $4.00 when she didn’t get enough money from a ‘ trick ’ that she had turned with a male adult. Q. In your conversation with Henry Lago, did Henry Lago tell j-ou anjdhiug concerning that particular incident? A. He did. Q. What was this about? A. Henry Lago, I questioned him relative to the payment to Jeri Clapper, and he particularly remembered giving her the $4.00 relative to this trick that she had turned. Q. Did you question him also with regard to the address where Jeri Clapper resided at that time? A. I did. Q. What did he tell you relative to that? A. He told me that, if he recalled correctly it would be some years back, that he used to pick her up regularly and take her to her home at 825 West Onondaga Street. Q. His recollection was that the address was 825 West Onondaga Street? A. Yes. Q. At that time did Lago indicate to you with whom she was living? A. Yes. Q. Who did he say she was living with? A. He stated that she was living at that time with Edward L00-cerello, or Whitey Looker. Q„ Did you, in his presence, reduce his conversation with you to writing? A. I did. Q. And did you give him an opportunity to read the entire statement that you prepared? A. I did. Q. Did he sign that statement? A. No, he didn’t. Q. Will you tell us what conversation you had concerning .the signing? A. I reduced the interview I had with Lago to writing, and then gave it to him to read, which he did. I asked him if the statement was true in all the parts and he said it was. And I asked him to subscribe to it and he-said he -wasn’t, going -to sign.it unless he had a chance to talk with his lawyer.. Q: Did you téllhim’to go ahead'and talk with his lawyer?’ A. Yds, if he wanted to. Q. Did he ever come back to sign the statement? A. He has never returned. Q. Do you have that statement with you? A. I do. Q. May I see it? (Statement shown to Mr. Ryan by Mr. Sardino) people’s exhibit 16 masked for identification. Q. I show you Exhibit 16 and ask you if you can identify it *1095for us? A. Yes, I can. Q. Tell us what it is. A. This is an affidavit form which I drew up after conversation with Henry Lago. Q. Is this the same statement that you have just referred to as the one Henry Lago read? A. It is. Q. .He read that in your presence, and after having read it, he refused to sign it ? A. Yes. Q. But he indicated to you that what was in there was true? A. I asked him in that particular conversation whether that statement was true in all of its parts, and he said yes. Q. It was after you asked him to subscribe to or sign this statement he wanted to call a lawyer first? A. Yes. Q. After he read it, did he sign this statement? A. No, sir. me. ryan: Any questions you would like to ask Mr. Sardino? juror: Did I understand that Henry Lago is a taxi driver now? A. No, his license to operate a taxicab has been revoked by the City of Syracuse, juror: What is he doing now? A. He is unemployed at the current time. (Witness excused) mr. ryan: I would like to read to you now the statement of Henry Lago. (Statement of Henry Lago read by Mr. Ryan, as follows):

henry n. lago, being duly sworn deposes and says: that the below statement made by me in the Onondaga County District Attorney’s Office this November 30th, 1961 in response to certain questions put to me by Sergeant Thomas J. Sardino, whom I know to be a member of the Syracuse Police Department. This statement is made of my own free will and volition, without any threats or promises, coercion or duress. That I live at 121 West Borden Avenue with my. wife and my date of birth is September 22, 1908. My Social Security Number is 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. That I am unemployed at this time. That I worked as a cab driver in the City of Syracuse and have been for approximately 32 years. That I was arrested once in 1959 by the Onondaga County Sheriff’s Office at the Dewitt Ranch Motel and at that time I had a Beverly Kopack, whose photograph I have been shown by Sergeant Sardino and identify to be the girl that was with me at the Dewitt Ranch Motel at the time I was arrested by the Onondaga County Sheriffs in the year 1959. Sgt. Sardino questioned me relative to knowing a person by the name of Whitey Loocerello and I know this fellow. I used to drive a taxi-cab with him. I remember also that he used to tend bar at Henry Andrew’s bar and at the Show Bar. I remember that when Whitey Loocerello was tending bar at the Show Bar he used to go with a girl by the name of Angie Clapper and I knew Angie Clapper’s reputation and that was known to me to be a prostitute. I had many occasions that she rode in my taxi-cab. I used to pick her up at her house —she lived in the 800 block of West Onondaga Street and I think the correct address was 825 West Onondaga Street. I used to transport her from that address at West Onondaga Street downtown to the Show Bar or to renna’s. There were various times when I transported Angie Clapper to the Dewitt Motel, the Sheraton Motel, the Mayfair Motel, Howard Hotel, Yates Hotel, Seymour Hotel ... on occasions she went there alone and there were occasions when she did ride there with an adult male. There were also occasions when I transported Whitey Loocerello and Angie Clapper together and I remember particularly that I drove them to their home at the 800 block of West Onondaga Street. Sgt. Sardino questioned, me particularly relative to a. transaction or deal I had with Angie Clapper about the time I gave her Four Dollars ($4.00) in my taxi-cab after she turned a trick and only received Ten Dollars ($10.00) for it. I remember this incident and it is true that I gave her Four Dollars ($4.00) to bring the total money that she had up to Fourteen Dollars ($14.00). Actually, I • was supposed to get Six Dollars ($6.00) for my cab fare and it was understood that she was going to charge this trick Twenty Dollars ($20.00) — Six Dollars that she *1096,would have given me would have left her with Fourteen Dollars. I never actually saw her give the money to Whitey Looeerello. On this particular occasion when I did give her the Four Dollars, I had this adult male in my cab and I called the show bar restaurant in the 500 block [if] Salina Street and asked for' Angie Clapper and then I proceeded over there with my taxicab and picked her up while this man was in my car. Then I dropped them off at one of the smaller hotels. I don’t remember now whether it was the Yates, Howard, or the Seymour Hotel, but when Angie Clapper came out, she complaining about having gotten only Ten Dollars for the trick and this was the time I gave her the Four Dollars to make up the difference.
I further remember that one time I took Angie Clapper and another girl by the name of Karen out to the King George Motel to see Gearge Traister and that these two girls were together and George Traister came out and paid me for the cabfare. I think I picked the two girls up at that time at henna’s bar on W. Onondaga Street. I also remember that another girl by the name of Pat who is in prison now, I think on a check charge and Lucille Hamlin. They also used to keep company with George Traister. While talking to Sgt. Sardino, he showed me a photograph of George Traister which I can identify as him. I know George Traister when I see him and this is the fellow who paid me the cab fare after I took ansie clapper and this other girl by the name of karen. I don’t remembeb her last name . . . she is also supposed to be in prison with this pat on a check charge.
As stated in the opening paragraph, I make this statement of my own free will and volition with no promises or threats, no coercion or duress being used and I have read all of the above and it is all true to the best of my knowledge and belief.
The measure of corroboration required in the so-called sexual crimes (Penal Law, §§ 2013, 2177, 2460, subd. 9) is more than that demanded by section 395 of the Code of Criminal Procedure which states that the confession of a defendant ‘ ‘ is not sufficient to warrant his conviction, without additional proof that the crime charged has been committed.” Under section 395, the independent proof need only establish the corpus delicti; it need not connect or tend to connect the defendant with it. (People v. Deacons, 109 N. Y. 374, 378; People v. Roach, 215 N. Y. 592, 600; People v. Taleisnik, 225 N. Y. 489, 494.)
The supporting evidence required under subdivision 9 of section 2460 of the Penal Law should go to the material portions of the crime defined by statute. (People v. Draper, 169 App. Div. 479, 482, supra.) The court stated in the Draper case (p. 482):
“ The statute provides. (Penal Law § 2460, subd. 9) that ‘no conviction 'shall be had under this section upon the testimony of the female unless supported by other evidence,’ and, while there is a colorable support in the evidence in this case of some of the matters alleged against the defendant, it is so utterly lacking in character that it ought not to stand as the basis of the judgment unless the supporting evidence goes to the material portions of some crime clearly defined by the statute.” (Emphasis supplied.)
In this case it appears that the only corroborative evidence presented to the Grand Jury which the People might claim tends to *1097connect the defendant, Lago, with the alleged crimes charged in the respective counts of the indictment, is the hearsay testimony of the witness, Martin, that Lago was in the same type of activity and the testimony of the police officer, Sardino.
Without passing upon the legality of the alleged unsigned and unsworn affidavit of Lago (People’s Exhibit No. 16), and assuming the truth of the statements therein contained, is this sufficient to satisfy the requirements of the statute! In my opinion, it is not. As was stated by the court in People v. Jelhe (1N Y 2d 321, supra) in discussing the sufficiency of the evidence to sustain the 8th count of the indictment in that case, the court said:
We are not deciding a civil action but a criminal prosecution. The presence in the record o£ some evidence is not sufficient to warrant the submission of a criminal case to the jury; and whenever a criminal charge is submitted to the jury, against the objection and exception of the defendant, upon proof which falls below the statutory standard of rebutting the presumption of innocence and of proving guilt beyond a reasonable doubt, a question of law is presented (People v. Ledwon, 153 N. Y. 10).
Certainly, no lesser standards should be required in testing upon motion the sufficiency of this indictment. Obviously there is nothing in the alleged corroborative evidence to sustain the charge of the complainant that the defendant, Lago, procured the complainant for immoral purposes, or took any money from her, or shared in any proceeds as charged in the second count of the indictment. The most that can be gleaned from the defendant’s unsigned statement is that he was paid his taxi fare by the alleged male customer. By the same token, there is nothing in the alleged unsigned statement of defendant, or in the testimony of the witnesses, Sardino and Martin, tending to connect the defendant, Lago, with the commission of the alleged crime charged in the first count of the indictment.
For the reasons stated, the indictment is dismissed against the defendant, Lago.' Submit order accordingly.